IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 7, 2018

## DEVIN ROGERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 12-01853     James M. Lammey, Judge**

_____

**No. W2017-01991-CCA-R3-PC**
_____

The petitioner, Devin Rogers, appeals the denial of his petition for post-conviction relief, which petition challenged his 2013 conviction of aggravated robbery, alleging that he was deprived of the effective assistance of counsel at trial. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and ROBERT L. HOLLOWAY, JR., JJ., joined.

Shannon M. Davis, Memphis, Tennessee, for the appellant, Devin Rogers.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Stephanie Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Shelby County Criminal Court jury convicted the petitioner of one count of aggravated robbery, and the trial court imposed a sentence of 11 years' incarceration. *See State v. Devin Rogers*, W2013-02442-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Jackson, Feb. 25, 2015).

The petitioner was charged with the November 17, 2011 aggravated robbery of a Foodland grocery store in Memphis, Tennessee. *Id.* At trial, Isabel Hernandez testified that she was working at the grocery store during the robbery. *Id.*, slip op at 4. Two African-American men entered the store, and one of the men had a pistol. *Id.* The men demanded that a customer "get money out of the register." *Id.* Ms.

Hernandez informed the two men that another register had money in it, at which point "the man with the gun pointed it at her head while she led him to that register." *Id.* Ms. Hernandez retrieved the money from the register and was able to push "the emergency button to alert the police." *Id.* At the same time, the other man was filling his backpack with merchandise. *Id.* Ms. Hernandez could not see the faces of the two men because each covered his face—one with a Halloween mask and the other with a bandana. *Id.* Ms. Hernandez described the men to the police as "African-American with an approximate height of 5'10"." *Id.*

The store's video surveillance system recorded the robbery, and the jury viewed the video. *Id.* Candido Hernandez testified that he is the husband of Isabel Hernandez and was also present at the Foodland grocery store during the robbery. *Id.* Mr. Hernandez saw two people "just outside the store and in the process of covering their faces." *Id.* When he saw the men heading toward the store, Mr. Hernandez entered the store ahead of them "to warn his wife." *Id.* Mr. Hernandez testified that "[o]ne of the men aimed a gun at him and then at [Ms. Hernandez]." *Id.* He also "saw one of the men grab a cash register." *Id.* Both men fled the store, and Mr. Hernandez chased them and called 9-1-1. *Id.* During the robbery, "the men took cell phones, cigarettes, and a computer." *Id.*

Several officers with the Memphis Police Department testified regarding evidence from the crime scene. *Id.*, slip op at 5. Officer Desmond Gibbs testified that he "received a request to pick up a robbery suspect on December 3, 2011." *Id.* He identified the petitioner in court as the suspect. *Id.* At the time of his arrest, the petitioner told Officer Gibbs his name was "Terrell McGee." *Id.*

Detective Fausto Frias testified that he questioned the petitioner at the police station. *Id.* Because the petitioner initially gave a false name, it took an hour to identify him. *Id.* After identifying the petitioner, Detective Frias "read the [petitioner] his *Miranda* rights and began an oral interview." *Id.* Detective Frias testified that the petitioner "read the *Miranda* rights out loud to the officers, the officers went over the rights line by line with the [petitioner], and the [petitioner] acknowledged verbally and in writing that he understood his rights." *Id.* Detective Frias testified further that the petitioner "appeared to understand what was going on and did not appear to be under the influence at the time he acknowledged that he understood his rights." *Id.*

During the interview, the petitioner gave a statement admitting to participating in the robbery of the Foodland grocery store along with two other men, "Terry Townsend" and "Ray." *Id.* Detective Frias testified that the person the petitioner referred to as "Ray" is Howard McClain. *Id.*, slip op. at 6. The petitioner identified

Townsend as having been armed during the robbery. *Id.*, slip op. at 5. The petitioner admitted that "they took a cash register, cigarettes, and 'some food.'" *Id.* The petitioner's statement detailed the robbery, stating that Ray entered the store pretending to be a customer. *Id.* The petitioner and Townsend covered their faces, "ran into the store," and "treated Ray like a customer" pointing a gun at him and making him carry merchandise outside. *Id.*, slip op. at 6. Townsend also "pointed a gun at 'the Mexican lady' and demanded money." *Id.* Detective Frias typed up the petitioner's statement and gave it to the petitioner to sign. *Id.*, slip op. at 5-6. The petitioner declined to make changes to the written statement and "initialed and signed the statement as being true and accuracte." *Id.*, slip op. at 6.

Sergeant James Taylor testified that one of the suspect's wallet and cellular telephone were found at the crime scene. *Id.* Howard McClain contacted police to locate his lost wallet and phone, and Sergeant Taylor had McClain brought in for questioning. *Id.* During his interivew, McClain named Terry Townsed but not the petitioner as an accomplice to the robbery. *Id.* Sergeant Taylor testified that he developed the petitioner as a suspect and spoke with the petitioner on December 5, 2011, after advising him of his *Miranda* rights. *Id.* The petitioner signed a form "acknowledging that he had been informed of his rights and wished to talk to the officers." *Id.* Sergeant Taylor showed the petitioner a photograph of the robbers taken from the surveillance video. *Id.* The petitioner identified the suspects in the photograph as himself and "Josh." *Id.*

The petitioner did not testify, and the defense presented no proof at trial. The jury convicted the petitioner of aggravated robbery. *Id.* This court affirmed the conviction. *Id.*, slip op. at 10. On February 17, 2016, the petitioner filed a pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, and the trial court held an evidentiary hearing on September 5, 2017.

At the evidentiary hearing, the petitioner testified that he has mental health issues, namely attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, and post-traumatic stress disorder ("PTSD"). The petitioner testified that he informed Detective Frias of his mental health issues on the day of his arrest. The petitioner testified that he also informed trial counsel of his mental health issues but that trial counsel did not thoroughly investigate his mental health issues. Prior to trial, the court held a suppression hearing to determine whether the petitioner's statement to the police would be admissible. At the suppression hearing, trial counsel asked the detective who took the petitioner's statement whether the petitioner had mental health issues and whether the petitioner was on medication at the time of the statement. The detective responded "yes" to both questions. The petitioner said that trial counsel also asked the detective whether he was concerned about the petitioner's being on medication and that

-3-

the detective responded that "everything was fine." Despite trial counsel's questions regarding the petitioner's mental health, trial counsel did not obtain a mental evaluation of the petitioner before trial. The petitioner testified that his mental health was an issue during this case and that he was not mentally competent at his trial. The petitioner asserted that trial counsel's failure to inquire further into the petitioner's mental health deprived him of the effective assistance of counsel.

The petitioner also testified that trial counsel never moved to suppress a statement of identification. The petitoner stated that a witness spoke with Detective Frias over the telephone during the petitioner's arrest. Detective Frias "told the witness to look out her window [of her] apartment to see if this [is] the right person." The petitioner testified that this witness did not give the police a statement "on the scene of [his] arrest" and "never pointed [him] out in any lineup." The petitioner testified further that the police lacked any physical evidence connecting him to the Foodland robbery. The petitioner asserted that, had trial counsel conducted a mental evaluation or moved to suppress the witness' statement of identification, he would have "most definitely" received a different outcome at trial.

During cross-examination, the petitioner conceded that the witness that identified him to Detective Frias over the phone during his arrest was a witness in another case and not the present case.

Trial counsel testified that he had been a criminal defense attorney since 1994 and had handled "multiple levels of felonies and misdemeanors." He had participated in more than 50 trials with "[p]robably . . . 10-15" of those being aggravated robberies or especially aggravated robberies. Trial counsel testified that he had had clients with mental health issues. In determining whether a client has mental health issues, trial counsel looked for two things: whether the client is "able to communicate and assist" in the case and whether the client is "capable of forming intent and knowing right from wrong at the time of the crime." Trial counsel testified that if he did not believe the client can meet these two requirements, he would "enter an order for a mental evaluation." Trial counsel explained that he would seek a mental evaluation for a client only for "something [he] think[s] is a potential problem because even the ones that [he] think[s] are potential problems 99.9 percent of the time come back competent." Trial counsel would seek a mental evaluation specifically when a client's "thinking is not linear, [the client is] not reasonable, [the client is] not making sense," or the client discloses a disability. He also looked to whether the client has the ability to understand the charges.

Trial counsel testified that he was appointed to represent the petitioner on one aggravated robbery charge and later five or six more indictments were brought against the petitioner. The present case arises from an aggravated robbery conviction separate from the initial charge for which trial counsel was appointed. Trial counsel testified that he did not seek a mental evaluation for the petitioner prior to this trial because "it was not even a topic of conversation" between him and the petitioner during preparation of the case. Trial counsel stated that he reviewed all of his notes from conversations with the petitioner and every letter he received from the petitioner "and at no point in time was there any please, I need a mental evaluation or any hey, I've got these issues." Every conversation trial counsel had with the petitioner "related to [the petitioner's] analysis of the statements that he gave, and how improper they were, and how they needed to be excluded." The petitioner's analysis of his statement to the police "was very detailed, very well thought out." Trial counsel testified that the petitioner "obviously is an intelligent man who had thought a lot about his statements and why they weren't proper."

Trial counsel filed a motion to suppress the petitioner's statement made to the police. Trial counsel testified that if the petitioner's mental health had been an issue, he would have sought a mental evaluation and "would have made the suppression hearing about [the petitioner's] mental health." Trial counsel stated that he asked questions about the petitioner's mental health at the suppression hearing only because the detective wrote "[a]re you on any medications for ADHD and bipolar" on the petitioner's statement. Trial counsel testified that he understood that the petitioner "indicated to the officers he had ADHD[] and bipolar disorder and that he was taking appropriate medications for his conditions." The defense's argument at the suppression hearing centered on the inappropriate nature and intimidation with which the officers questioned the petitioner and "very technical arguments" such as the statement's "lack of signatures . . . [and] lack of dates." Trial counsel testified that Detective Frias described obtaining the petitioner's statement as follows: A lady who had been robbed by the petitioner saw him, called the police, and told them that the man who robbed her was there. The police took the petitioner to the police station to question him about the robbery of that woman. While at the station, the petitioner "start[ed] talking about robberies they had no idea he was a part of and in the end of the day, after multiple hours of questioning, because it was five or six different robberies, they end up with five or six different typed statements signed by [the petitioner]."

Trial counsel asserted that he "was trying very hard to fight for the petitioner. Had he for one minute made his mental health an issue before [the] first trial, it absolutely would have been explored." Trial counsel testified that he did not think that "there would have been anything to it" because the petitioner "understood why he was

charged, he understood what he was charged with, and then he understood the ways he wanted to attack the State's evidence." Trial counsel testified that he learned of the petitioner's potential mental health issues after he learned that the petitioner was housed in the mental health ward of the Bledsoe County Correctional Facility. After learning this information, trial counsel sought a mental health evaluation for the petitioner "because [he] may have missed something." The mental evaluation, which was done after the trial in this case, indicated that the petitioner was competent.

On cross-examination, trial counsel admitted that the petitioner's being housed in the mental health ward was "very much a red flag." He also stated that he perceived the petitioner's focus on technical issues in the case "a little bit odd" but that he understood this behavior to indicate that the petitioner "realized he was dead in the water and he was looking at the only thing he thought would save him." Trial counsel testified that he learned of the petitioner's bipolar disorder and ADHD at the suppression hearing, but he did not seek a mental evaluation at that time because the petitioner did not discuss the issue with trial counsel after the hearing. Trial counsel acknowledged that not all clients with mental health issues tell him about the issue and that most do not ask for a mental evaluation. Trial counsel stated that, considering the petitioner was housed in the mental health ward, "obviously [he] missed some red flag." Trial counsel also testified that this sort of indicator of mental health issues affects his approach to a case but does not necessarily affect the trial.

In response to questions posed by the court, trial counsel testified that he did not observe anything with the petitioner indicating the need for a mental evaluation. Trial counsel stated that, after he had a mental evaluation done on the petitioner, the petitioner "latched on to that idea" in this case. Trial counsel clarified that, after the petitioner was convicted and sentenced in the present case and while his other five cases were in progress, trial counsel learned that the petitioner was being held in the mental ward. At that point, trial counsel began inquiring into the petitioner's mental health, and the petitioner "started telling [him] oh yeah, I've had issues my whole life." At that point, trial counsel obtained a mental evaluation of the petitioner, which deemed him competent.

After hearing all of the evidence, the post-conviction court denied relief. The court gave great weight to trial counsel's testimony "and not much weight in what the [petitioner] has to say." The post-conviction court found no evidence that trial counsel "did anything that would fall below the standards expected." The post-conviction court also found that, even if trial counsel's representation fell below the standard, the petitioner was not prejudiced "in any way," stating that "having done a subsequent [mental] evaluation, [trial counsel] basically confirmed what his original

belief was, . . . that there wasn't an issue." The trial court's written order denying post-conviction relief incorporated its oral findings of fact and conclusions of law. This timely appeal followed.

On appeal, the petitioner argues that the post-conviction court erred by denying post-conviction relief, asserting that trial counsel performed deficiently by failing to fully investigate the petitioner's mental health issues and by failing to move to suppress the victim's statement of identification.[1] The State contends that the post-conviction court did not err by denying post-conviction relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is

---

[1] In his pro se petition for post-conviction relief, the petitioner raised 25 claims related to the ineffective assistance of counsel. His amended petition incorporated all 25 claims; however, he raises only these two claims on appeal. Accordingly, we will treat all other claims as waived on appeal.

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In the present case, the record fully supports the post-conviction court's determination that trial counsel's performance was not deficient in regard to the petitioner's mental health. The post-conviction court accredited trial counsel's testimony that the petitioner was intelligent. Although the petitioner testified that he had mental health issues, no mental health expert testified at the evidentiary hearing. We agree with the post-conviction court that even if trial counsel's performance had been deficient, the petitioner did not suffer prejudice because a subsequent mental evaluation concluded that the petitioner was competent. We hold that the post-conviction court did not err by finding that the petitioner failed to show that trial counsel's failure to seek a mental evaluation prior to trial equated to ineffective assistance.

We also agree with the post-conviction court's denial of relief on the issue of trial counsel's failure to move to suppress the victim's statement of identification. In this appeal, the petitioner asserts that trial counsel's performance was deficient because he failed to move to suppress the Foodland robbery victim's statement of identification. However, the victim of the robbery at issue in this case, Ms. Hernandez, acknowledged that she could not see the robbers' faces, and she described the robbers only by their height and their race. She did not make a statement identifying the petitioner as one of the robbers. No statement of identification by the victim in the present case was presented. Furthermore, even if trial counsel's performance was deemed deficient, the petitioner suffered no prejudice. In addition to the victim's testimony at trial, the jury heard evidence of the petitioner's confession to the crime and his identifying himself as one of the robbers in the image from the surveillance video. In light of the petitioner's statements admitted at trial, the petitioner has failed to demonstrate how suppression of

the victim's statement regarding the race and height of the robbers would have altered the outcome of this case.

Finding no error in the determinations of the post-conviction court, we hold that the petitioner has failed to prove by clear and convincing evidence sufficient facts to establish that trial counsel's representation was deficient and prejudicial.  Accordingly, we affirm the order of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE